# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of -- | ) | |
| | ) | |
| GSC Construction, Incorporated | ) | ASBCA Nos. 59046, 59957 |
| | ) | |
| Under Contract No. W9126G-11-D-0061 | ) | |

APPEARANCE FOR THE APPELLANT:      James S. DelSordo, Esq.
                                      Argus Legal, PLLC
                                      Manassas, VA

APPEARANCES FOR THE GOVERNMENT:   Michael B. Goodman, Esq.
                                        Engineer Chief Trial Attorney
                                      Jason R. Chester, Esq.
                                        Ronald J. Goodeyon, Esq.
                                        Stephanie J. Milburn, Esq.
                                        Engineer Trial Attorneys
                                        U.S. Army Engineer District, Tulsa

## MAJORITY OPINION BY ADMINISTRATIVE JUDGE PAGE[1]

In this construction-contract case, GSC Construction, Inc. (GSC, appellant or the contractor) seeks additional compensation from the government. It asserts that the government ordered it to perform extra-contractual work for which it has not been paid, and also seeks the release of liquidated damages and retainage withheld by the government. Both entitlement and quantum are before the Board.[2] Familiarity is presumed with the Board's denial of the government's motion for summary judgment in *GSC Construction, Inc.*, ASBCA No. 59046, 14-1 BCA ¶ 35,739. We grant the appeals in part.

## FINDINGS OF FACT

*The Contract, Relevant Request for Proposals (RFP) Amendments, and Task Order*

As described in ¶ 1.1 GENERAL DESCRIPTION OF WORK, the solicitation was for "Base Multiple Award Task Order Contracts (MATOC) for Design and Construction of Warehouses in the West of the Mississippi." The Department of the Army (Army or

---

[1] These appeals were heard by Judge Timothy P. McIlmail.

[2] *See, e.g.*, tr. 1/61; *see also* the Board's Order of May 19, 2015 concurring with the parties' joint status report of May 14, 2015 requesting that entitlement and quantum be heard in a single proceeding.

government) intended to award more than one contract, with task orders for individual projects. (R4, tab 4(e) at 1740)

On September 15, 2011, the Army awarded Task Order 0001 (the task order) to GSC. This was done pursuant to Contract No. W9126G-11-D-0061 (the contract) (R4, tab 4(p)), an indefinite delivery, indefinite quantity (ID/IQ) contract for work at Ft. Sill, Oklahoma. The task order amount was $11,951,460 (*id.* at 3377). The contract as awarded incorporated by reference "GSC's proposal dated 29 August 2011, solicitation W9126G-11-R-0053, and all twelve (12) amendments." Contract line items (CLINS) that described particular work were each priced in a fixed, lump sum amount. (*Id.* at 3378) According to § 01 10.00, ¶ 2.0 SCOPE, the purpose of the contract was to "Construct a combined Central Issue Facility (CIF) for permanent party troops and soldiers in Advanced Individual Training (AIT)" (*id.*, tab 4(e) at 1768).

Contract § 00 72 00, ¶ 1.3 PROPOSED BETTERMENTS (AUG [19]97) also made GSC's proposal part of the contract:

> (a) The minimum requirements of the contract are identified in the Request for Proposal. All betterments offered in the proposal become a requirement of the awarded contract.
> (b) "Betterment" is defined as any component or system which exceeds the minimum requirements stated in the Request for Proposal. This includes all betterments identified in the proposal and/or all Government identified betterments.

(R4, tab 4(a) at 32; *see also* § 00 73 00 (ID/IQ) SPECIAL CONTRACT REQUIREMENTS, ¶ 1.3, *id.* at 32)

Paragraph 1.10 BASE ID/IQ CONTRACT specifically applied the "requirements of the Base ID/IQ Contract Division 00 PROCUREMENT AND CONTRACTING REQUIREMENTS sections and documents and Division 01 GENERAL REQUIREMENTS sections...except as otherwise specified in the task order documents" (R4, tab 4(p) at 3388).

RFP Amendment 7, which was effective March 28, 2011 (R4, tab H at 3150), required at ¶ 2.b the following change to the Statement of Work (SOW): "In paragraph 6.4.6.1, replace all 'Infrastructure Contractor' with 'D/B [Design/Build] Contractor'" (*id.* at 3151).

Contract § 01 45 04.00 10, ¶ 3.8 COMPLETION INSPECTION provides in ¶ 3.8.1 for preparation of a "punch list of items which do not conform to the approved drawings and specifications...." After these deficiencies were corrected, the parties were to proceed to

2

a "Pre-Final Inspection (¶ 3.8.2) then a Final Acceptance Inspection (¶ 3.8.3)." (R4, tab 4(p) at 3556)

Among standard contract clauses from the Federal Acquisition Regulation (FAR) is 52.211-10 COMMENCEMENT, PROSECUTION AND COMPLETION OF WORK (APR 1984). At ¶ (a), this clause requires the design and construction of the CIF to be completed no later than 519 days after receipt of notice to proceed. (R4, tab 4(p) at 3383) That notice was issued November 17, 2011 (*id.*, tab Q).

Other FAR clauses incorporated by reference were 52.236-21 SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION (FEB 1997) and 52.236-21 SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION ALT 1 (APR 1984) (R4, tab 4(a) at 9). *See also* § 00 72 00 SPECIAL CONTRACT REQUIREMENTS ¶ 1.2 DESIGN/BUILD CONTRACT – ORDER OF PRECEDENCE (AUG [19]97), which incorporates the "successful offeror's accepted proposal" as part of the contract (*id.* at 32).

In accordance with ¶ (e) of FAR 52.232-5 PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (SEP 2002), also incorporated by reference, the contracting officer (CO) was allowed to "retain a maximum of 10 percent of the amount of the payment [due the contractor] until satisfactory progress is achieved" (R4, tab 4 at 9).

FAR clauses incorporated by full text included 52.211-12 LIQUIDATED DAMAGES – CONSTRUCTION (SEP 2000) (R4, tab 4(a) at 12). This provision is reiterated at § 00 73 10, ¶ 1.3, which allowed the government to assess against GSC "$1280 for each calendar day of delay until the work is completed or accepted..." (R4, tab 4(p) at 3384).

The contract also included FAR 52.211-10 (R4, tab 4(a) at 12). Relevant here is added note (3), which states:

> (3) O & M Manuals. O & M Manuals shall be developed and submitted in accordance with Contract Section 01 78 02.00.10 Closeout Submittals, at least 60 calendar days prior to the scheduled contract completion date. Upon approval of fully developed O & M Manuals, the Contractor shall have earned the withholding amount shown for "Operation and Maintenance Manuals" in Contract Section 01 78 02.00 Closeout Submittals.

(*Id.*, tab 4(p) at 3383-84)

In § 00 73 10, TASK ORDER SUPPLEMENTAL CONTRACT REQUIREMENTS, ¶ 1.4 contains Defense Federal Acquisition Regulation (DFARS) clause, 252.236-7001 CONTRACT DRAWINGS, MAPS, AND SPECIFICATIONS (AUG 2000). Of particular interest

are ¶ 1.4(c)(1), which states that "Large-scale drawings shall govern small-scale drawings" and ¶ 1.4(d), which provides:

> Omissions from the drawings or specifications or the misdescription of details of work which are manifestly necessary to carry out the intent of the drawings and specifications, or that are customarily performed, shall not relieve the Contractor from performing such omitted or misdescribed details of the work. The Contractor shall perform such details as if fully and correctly set forth and described in the drawings and specifications.

(R4, tab 4(p) at 3384-85)

SOW ¶ 6.3.1.4 states that the infrastructure drawings were being provided to the D/B contractor as a reference "for information only" (R4, tab 4(e) at 1817). SOW ¶ 6.3.1.5 reiterates that "infrastructure drawings are provided as 'for information only' reference" (*id.*, tab 4(p) at 3472).

SOW ¶ 6.3.2 SITE STRUCTURES AND AMENITIES calls for the contractor to: "Provide one dumpster pad and enclosure per facility" (R4, tab 4(e) at 1818).

In relevant part, RFP Amendment 4, § 01 10 00, SOW ¶ 6.4.6 BASE UTILITY INFORMATION apprises the contractor of the following:

> 6.4.6.1 Utilities: The Installation's DPW supervises infrastructure and utilities. Most utilities are privatized.... Existing utility services such as potable water [and] sanitary sewer...are not located near the site. Closest locations for tie-ins are shown on drawings in Appendix J. Coordinate and plan utilities with the A/E Integrator through the Contracting Officer. The site plan contained in Appendix J provides utility main routing and general orientation for points of connection for each facility. Prior to final design, verify the locations and sizes of utility services with the A/E Integrator.

(R4, tab 4(e) at 1819)

The SOW furnished in RFP Amendment 4 provides specifications for water mains in ¶ 6.4.6.1(c):

> Water mains are shown on the drawings at Appendix J.... The Infrastructure Contractor will provide the potable water

4

service between the main line to the 5-foot line of the building. Provide potable water service from the 5-foot line to the facility and within the building.... *The Government will provide primary or main water pipe distribution, including the water meter and vault.* Design and construct water service lines from the 5-foot line to the building to meet the utility provider's installation details and specification. The Government will provide the Post Indicator Valve (PIV) and any bollards required for protection and route the fire water line (separate from the domestic supply) to 5 feet from the building....

(R4, tab 4(e) at 1819; *see also id.*, tab 4(p) at 3474) (emphasis added)

SOW ¶ 6.4.6.l(d) provides:

The Infrastructure Contractor will design and construct the sanitary sewer service line between the sanitary sewer main to 5 feet from the building including cleanout or manhole. Sanitary sewer mains are shown on the drawings in Appendix J. Coordinate points of connection through the CO with the service provider [American Water Enterprises] (AWE).

(R4, tab 4(p) at 3474)

RFP Amendment 4 introduced Appendix EE, "Infrastructure Drawings," which includes a drawing entitled "OVERALL PROJECT CONSTRUCTION ACCESS" (R4, tab 4(p) at 4090, 4093). "GENERAL PROJECT SCOPE NOTES," note 4 "WATER SUPPLY AND DISTRIBUTION" states in relevant part:

MULTIPLE EXISTING WATER LINES WILL NEED TO BE REROUTED AS PART OF THIS PROJECT. THERE IS AN EXISTING 12" TRANSITE AND 24" CAST IRON WATER LINE RUNNING THRU THE FOOTPRINT OF THE NEW FACILITY. THE 12" LINE WILL BE REMOVED AND REROUTED AROUND THE SOUTH SIDE OF THE FACILITY. **AN 8" LOOP WILL BE CONNECTED TO THIS LINE TO SERVE THE FACILITY WATER DEMANDS.** THE EXISTING 24" CAST IRON WATER LINE IS ABANDONED.... THE PORTION OF THIS LINE UNDER THE FOOTPRINT OF THE NEW FACILITY WILL BE REMOVED. AN

5

EXISTING 24" WATER LINE UNDER THE NEW POV
PARKING LOTS WILL NEED TO [BE] REMOVED.

(*Id.* at 4093) (capitals in original, bold added as emphasis)

Appendix EE includes a drawing entitled "UTILITY PLAN." Note 2 of that drawing states that the "CONTRACTOR WILL PROVIDE ANY SANITARY SEWER ELEMENT REQUIRED OUTSIDE 5' OF THE BUILDING INCLUDING A CLEANOUT OR MANHOLE AND CAP FOR FUTURE CONNECTION." (R4, tab 4(p) at 4102)

The drawings in Appendix EE provided direction supplementing the water main specifications:

> 4. WATER SUPPLY AND DISTRIBUTION. AS PART OF
> THE PROJECT, THE EXISTING FIRE HYDRANTS IN
> THE AREA ARE TO BE TESTED AND THE DATA
> PROVIDED TO [AWE] TO CHECK AGAINST THEIR
> MODEL. AFTER DISCUSSION WITH AWE IT HAS
> BEEN DETERMINED THERE ARE NO CONNECTION
> POINTS OR FIRE HYDRANTS ON THE 12" WATER
> LINE AVAILABLE FOR FLOW TESTING.... THERE IS
> AN EXISTING 12" TRANSITE AND 24" CAST IRON
> WATER LINE RUNNING THRU THE FOOTPRINT OF
> THE NEW FACILITY. THE 12" LINE WILL BE
> REMOVED AND REROUTED AROUND THE SOUTH
> SIDE OF THE FACILITY. AN 8" LOOP WILL BE
> CONNECTED TO THIS LINE TO SERVE THE FACILITY
> WATER DEMANDS. THE EXISTING 24" CAST IRON
> WATER LINE IS ABANDONED.

(R4, tab 4(e) at 2438)

Keyed notes 1 and 4 to Drawing C120 [Dwg. C120] in Appendix EE provide:

> KEYED NOTE 1: "CONTRACTOR WILL PROVIDE
> DOMESTIC WATER LINE AND WATER METER SET IN
> A VAULT OUTSIDE THE FACILITY. CONTRACTOR
> WILL TAKE DOMESTIC WATER LINE AND ROUTE
> WITHIN THE BUILDING THROUGH A BACKFLOW
> PREVENTOR [SIC] (GENERALLY LOCATED IN
> MECHANICAL ROOM)."

6

KEYED NOTE 4: "CONTRACTOR WILL PROVIDE THE
PIV AND ROUTE FIRE WATERLINE (SEPARATE FROM
THE DOMESTIC SUPPLY). CONTRACTOR WILL TAKE
FIRE WATER LINE AND ROUTE WITHIN THE
BUILDING AND REQUIRED ELEMENTS TO PROVIDE
THE FIRE PROTECTION SYSTEM."

(R4, tab 4(e) at 2447)

SOW ¶ 6.4.6.1, ¶ (d) states:

> (d) Sanitary Sewer – With regard to the sanitary sewer,
> Amendment 4 provides: Sanitary Sewer: The Infrastructure
> Contractor will **design** and **construct** the sanitary sewer
> service line between the sanitary sewer main to 5 feet from
> the building, including cleanout or manhole. Sanitary sewer
> mains are shown on the drawings in Appendix [EE].
> Coordinate points of connection through CO with the service
> provider (AWE).

(R4, tab 4(e) at 1819) (emphasis added)

The Overall Project Construction Access drawing at note 5, "SANITARY
SEWER," states:

> THE NEW MAINS WILL BE 8" WITH THE NEW
> SERVICE LINES 6". THE NEW MAINS AND SERVICE
> LINES WILL HAVE PRE-CAST MANHOLES
> INSTALLED TO ALLOW FOR THE CONNECTION OF
> THE NEW FACILITY.

(R4, tab 4(p) at 4093)

The Utility Plan drawing, at note 4, states that the "CONTRACTOR WILL
PROVIDE THE PIV AND ROUTE FIRE WATERLINE (SEPARATE FROM THE
DOMESTIC SUPPLY). CONTRACTOR WILL TAKE FIRE WATER LINE AND
ROUTE WITHIN THE BUILDING." It required GSC to provide for the fire protection
system. (R4, tab 4(p) at 4102)

*GSC's April 7, 2011 Proposal*

Mr. Brannon Cundey of GSC helped estimate the job for appellant and served as a
scheduler and project manager for the contract (tr. 2/13-14). He testified that GSC

interpreted contract provisions for the sanitary sewer service line (*id.* at 2/24; R4, tab 4(e) at 1819) as changed by Amendment 7 (R4, tab 4h), as well as the information on Dwg. C120, keyed note 2 (R4, tab 4(c) at 2447). GSC understood this to require the contractor to build sewer lines out to the manholes identified on Dwg. C120, where the sewer main would be provided by the government (tr. 2/79-80).

GSC's proposal of April 7, 2011 contained the following relevant information pertaining to the sanitary sewer:

> A new 6 inch sanitary sewer will exit the proposed building along the north side and extend approximately 60 ft to the north into a new manhole and then turn east and travel to the next manhole approximately 140lf [lineal feet] at approximately 2.0% slope. Another 6 inch sanitary line, approximately 80 lf will exit the building along the east side of the building and travel to the same manhole that the northern lines ties into. At this manhole the sanitary line size will be increased to an 8 inch line and the [sic] travel to the existing sanitary manhole, approximately 240lf at 1.0%, the existing manhole is located [at] the northeast of the site that serves the existing building....

(R4, tab 4(j) at 3321)

Appellant's proposal also contained the following regarding the fire protection loop:

> A new 12 inch PVC water line waterline [sic] will be installed and routed approximately 680lf as shown on the utility plans.... An 8 inch PVC fire loop will then circumvent the building approximately 1500 lf to complete the required fire protection loop.... There are three new fire hydrants.... These will have approximately 120lf of 6 inch PVC and ductile iron pipe to complete the tie in.

(R4, tab 4(j) at 3321)

Although the RFP and contract called for an 8-inch pipe to be used for the fire protection loop (*see* R4, tab 4(p) at 4090, 4093) and GSC proposed to install the fire loop using this size (*id.*, tab 4(j) at 3321), GSC later "upsized" it to a 10-inch pipe (tr. 1/49-51). Appellant offered no proof that it was required by the government to change this 8-inch pipe to a 10-inch one. Counsel for GSC said that the change in pipe size was not part of

8

the claim (tr. 2/16; *see also* R4, tab 3 at 0002 discussing the 8-inch line as part of the claim).[3]

*The Truck Turnaround and Beneficial Occupancy of the CIF*

Section 2.0 SCOPE stated that "Design requirements and assumptions include but are not limited to the following...." At ¶ (g), this provision called for the contractor to "[a]ssume that supply trucks are tractor-trailers hauling 53 feet long shipping containers." (R4, tab 4(p) at 3422)

At the hearing, GSC furnished a photograph showing a tractor-trailer parked at the loading dock. GSC's "on-site superintendent project manager of the construction activities" testified that he took the photograph sometime between the first and third weeks of October, 2013. (App. ex. 18; tr. 2/76, 91-94)

GSC asserts that the government required it to perform additional work on a number of items, including increasing the size of the loading dock area (*see* app. exs. 19, 29-31; tr. 3/11-14). The contractor says that it had to relocate the dumpster pad after finalizing the construction design and drawings because the government insisted that the contract required a turnaround area in the loading dock large enough to accommodate a 53-foot long truck (app. br. at 6 ¶ 21 citing R4, tabs 27- 28).

According to a photograph taken by the contractor that is date-stamped "10/2/2013" (app. ex. 27), the government had installed office furniture including cubicle setups by that date. This was in the administrative area of the CIF. (Tr. 2/43-45)

The CO's representative (COR) notified GSC on November 21, 2013 that the previously-installed truck turnaround was found to be deficient during the delivery of government-furnished storage rack systems to the warehouse. According to the government, "A tractor-trailer hauling a 53 ft long shipping container is unable to enter the space and maneuver to the loading dock within the confines of the aprons and driveways provided." Appellant was told that a design defect resulting from a previously approved deviation for a dumpster pad "did not become obvious until it was seen that the space provided did not meet the required performance criteria." The COR called for immediate corrective action and said that payment would not be approved until "this deficient work" was corrected. (R4, tab 38)

GSC took exception to the government's rejection of the turnaround. It reminded the government that the design, which included the dumpster pad location, was

---

[3] As counsel for appellant confirmed for the Board, ASBCA No. 59046 concerned "the sanitary sewer line, the 12-inch water line, the 24-inch water line, [and] the 10-inch fire loop..." (tr. 2/5, 9-10).

9

previously approved. (R4, tab 40) The COR informed the contractor that having the tractor-trailer back up from Randolph Road to the loading dock "does not meet the design requirement" (*id.*, tab 42). On January 16, 2014, the CO issued a "Show Cause Notice" to GSC over this issue, and warned of possible termination of the contract for default if not corrected (*id.*, tab 50).

The government advised on January 30, 2014 that GSC's design accommodated a truck turning radius of only 42.5 feet, and not 53 feet as required (R4, tab 55). The contractor replied on February 5, 2014, and disagreed with the CO's position. It reminded the government that work to date had been done with the government's approval, and denied that the contract required a design that allowed a truck to make a single point turn to access the loading dock (*id.*, tab 58). The government's letter of February 19, 2014 said that it had never required a single-point turn, and restated that prior acceptance of work was not conclusive where deficiencies were later discovered (*id.*, tab 62).

Mr. McKnight testified that the government had installed large racks in the warehouse and stocked that area before it raised alleged deficiencies in the truck turnaround. He said he looked at the daily reports for either December 27 or 28, 2013, and confirmed that the building was then being used. (Tr. 1/67-69)

*Final Completion and Punch List Items*

A November 6, 2013 memorandum from the Boatwright Company, PA (Boatwright), which served as GSC's "commissioning agent" (tr. 2/66-67, 69-70), assessed "system components [that] should be completed as soon as possible." Items to be remedied included ductwork in the safe areas, boiler #1 (although boilers #2 and #3 were operational and might suffice), the mini-split system that cooled the server room, and balancing of the secondary heating hot water pumps (although the differential pressure was being controlled by other means). Boatwright observed that only a partial review could be done for the "local HVAC DDC system." Despite these shortcomings, it was Boatwright's "professional opinion that this facility can be used for its intended purpose." (App. ex. 19)

The government repeatedly reminded the contractor that certain contract requirements, including punch list items, remained incomplete, but the contractor took exception to this (*see, e.g.*, R4, tabs 59-61). GSC told the government that Boatwright previously had opined that none of the missing items should hold up building acceptance (*id.*, tab 60).

10

*The Claims and the Contracting Officer's Decisions*

On March 15, 2012, GSC submitted Request for Information 0014 (RFI-0014), asking for guidance: "Amendment 4 introduced new requirements to the RFP regarding the site utilities in specification section 01 10 00 para 6.4.6. Should GSC disregard the RFP specifications regarding the utilities and proceed with the verbage [sic] of GSC's narrative regarding Site Utilities?" (R4, tab 5)

On March 26, 2012, the Administrative Contracting Officer (ACO) directed GSC "to design and install all items referenced in the RFP dealing with the 'infrastructure contractor.'" He continued that, in accordance with GSC's "proposal and the awarded contract, with all amendments, I consider the design and construction of all items associated with the infrastructure contractor as belonging [t]o the D/B Contractor." (R4, tab 6)

GSC disagreed with this in its March 27, 2012 request for a CO's decision:

> The correspondence received [from the ACO] on 3-26-12 states GSC is to proceed with designing and installing all of the utilities for the project. The contract documents issued by the government during the RFP process regarding responsibility for the infrastructure of this project state in fact almost the exact opposite. Amendment 4 para 5.2.5 "Utilities" references para. 6.4.6 "Base Utility Information" and this describes all of the contractor's responsibility clearly.

(R4, tab 7 at 1)

GSC's request continued:

> GSC feels that the specifications clearly state the utility requirements for the infrastructure of the project and GSC is asking for a Contracting Officer['s] Final Decision [COFD] on GSC's positions as stated above. GSC has found no information in any other amendment altering the "Base Utility Requirements." GSC believes that it does not have any responsibility beyond the requirements of specification section 01 10 00 para. 6.4.6.1. GSC estimates the additional work as directed by your office for the water mains, sanitary sewer, electrical distribution primary, and additional

11

> communications is $502,907.50 and will also require a 90 day contract extension.

(R4, tab 7 at 2)

Although the parties met on May 17, 2012, the CO did not respond to GSC's request. On June 13, 2012, the contractor reiterated its concerns and again requested a COFD regarding these issues. (R4, tab 8)

The CO on August 22, 2012 issued a "Letter of Direction," also referenced as "SL #0007," in response to GSC's request of March 27, 2012. The CO said that a COFD was "only rendered for Certified Claims,"[4] but agreed to issue a "Contracting Officer's Decision pursuant to your request." Although the CO directed GSC to perform in a certain manner, the document was not styled as a COFD nor did it recite the contractor's appeal rights. (R4, tab 9)[5]

The CO interpreted SOW ¶ 6.4.6.1(c) to mean that "the Government [would] provide primary or main water pipe distribution, including water meter and vault." It would also "provide the Post Indicator Valve (PIV) and any bollards required for protection and route the fire water line (separate from the domestic supply) to 5 feet from the building." As the "Infrastructure/D/B Contractor," GSC was required to coordinate points of contact with "service provider" (AWE). Appellant also had to provide potable water service "between the main line to the 5-foot line of the building" as well as "from the 5-foot line to the facility and within the building, through a backflow preventer." GSC was told that it was responsible for the design and construction of all building and site work depicted in Appendices EE and FF. (R4, tab 9 at 7-8)

The CO stated that "The Government will provide primary or main water pipe distribution, including the meter and vault," but noted that there was "a difference between the drawings and specifications in reference to the meter and vault (Refer to Keyed Note 1 in [Dwg.] C120)." The CO resolved this discrepancy by telling GSC that "In accordance with the contract, specifically FAR Clause 52.326.21, the specifications shall govern." Therefore, "GSC is to design and construct water service lines from the

---

[4] The Contract Disputes Act of 1978 at 41 U.S.C. § 7103(a)(3) requires a contracting officer to issue a written decision on each claim by a contractor against the Federal Government. In accordance with 41 U.S.C. § 7103(b)(1), the contractor must properly certify claims of more than $100,000.

[5] Although the CO did not separately number the paragraphs in this correspondence, GSC's March 14, 2013 "Request for Contracting Officer Final Decision" (R4, tab 2) refers to specific numbered paragraphs. We correlate the references in the two documents by topic.

12

5-foot line to the building to meet [AWE's] installation details and specifications." (R4, tab 9 at 7)

The CO noted that there were two different types of connections between the CIF and the potable water supply: one was for the "domestic water supply" and the other was a "fire water line." The government again distinguished Dwg. C120 from the specifications, and cited FAR 52.236.21 SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION for the proposition that "the specifications shall govern.... GSC will take fire water line and route within the building and required elements to provide the fire protection system." (R4, tab 9 at 7)

As with the government's interpretation of SOW ¶ 6.4.6.1(c), the CO's letter of August 22, 2012 relied upon FAR 52.236.21 in interpreting ¶ 6.4.6.1(d) SANITARY SEWER to require GSC to "design and construct the sanitary sewer service line between the sanitary sewer main to 5 feet from the building, including cleanout or manhole" (R4, tab 9 at 7-8).

Contract Modification No. A00002 was effective on February 19, 2013. It increased the contract amount by $47,951, and called for appellant to "provide and install approximately 150 LF of 8 [inch] Fire Protection water line, extending from the water line to a point 5 ft from the building." The contract completion date remained unchanged. (R4, tab 4(s))

GSC's certified claim dated March 14, 2013 sought $826,355 for work related to "Natural Gas, Water Mains, Sanitary Sewer, Electrical, and Communications" as required by the government's letter of August 22, 2012. (R4, tab 2 at 1, 6) GSC agreed that Amendment No. 7 added certain responsibilities for the "'Infrastructure Contractor' to [the] 'Design Build Contractor'" in SOW § 6.4.6.1 and that it was required under ¶ 6.4.6.1 (c) to "provide the portable [sic] water service between the main line to the 5-foot line of the building, but claimed that the government "owed [it] for the design of the line from the water main installed by the base to the 5' line of the building." The contractor noted that the government in the August 22, 2012 letter of direction had said that "**the government will provide primary or main water pipe distribution, including the meter and vault.**" Appellant continued that it "has not receive[d] a change order for moving the 24" primary or main water line and is requesting monies for this activity in this decision." Additionally, GSC sought a COFD "for the design and construction costs for installing the sanitary sewer main from the housing development to the project." (R4, tab 2 at 4-5) (emphasis in original)

GSC amended its claim on June 18, 2013, and provided information as requested by the CO. The contractor sought an extension of 112 days, and asked for "extended overhead in the amount of $162,309.28" that it associated with government-caused delay. (R4, tab 3 at 1-2)

13

As part of its claim for allegedly additional water utilities work, GSC passed through the claims of its subcontractor Evans & Associates, which GSC hired to do the tasks described in app. ex. 1 (tr. 1/54). In relevant part, the exhibit seeks compensation in the amount of $191, 282 for "the installation of the site fire water line that includes piping and valves to fire hydrants and 5' out of the building, any remaining requirements for the site domestic water lines, installation [of] C905 24" pipe and removal of the 24" water main that is being relocated" (app. ex. 1). GSC supported amounts sought for the water utilities work with its change order to Evans for this effort (app. ex. 4); a spreadsheet showing various costs (app. ex. 5); and an email exchange (app. ex. 6). (Tr. 1/43-44, 55-58, 2/30-34)

The COFD of August 22, 2013 granted appellant's claim in part. The CO found merit in the amount of $442,119.63 for "design and installation costs for the electrical distribution line and the site communication line." Relevant to these appeals, the CO denied appellant's claim for $546,544.65 for "[t]he remaining site utilities, (12" water line, relocate 24" water line, 10" fire loop, sanitary sewer line, and site lighting)." (R4, tab 1 at 1, 13) Appellant received the COFD on August 30, 2013, and timely appealed.

On February 11, 2015, GSC filed another claim for $468,808.43 for additional work and delay attributed to both the government and bad weather. It broke down the amount as follows: truck turnaround area ($92,641.47); withheld payments ($373,166.96) (this includes liquidated damages and "improperly withheld funds"); and claim preparation costs ($3,000). GSC argued that the government's failure to approve its requests for time extensions constructively accelerated the contract. (R4, tab 28)

The COFD of April 8, 2015 deemed GSC's February 11, 2015 claim without merit and denied it. The government said that the deficiency in the truck turnaround area was discovered during a government Quality Assurance inspection of November 18, 2013, "when a tractor trailer hauling a 53-foot container was unable to enter the space and maneuver to the loading dock within the confines of the aprons and driveways provided." The CO said that GSC's design did not meet RFP requirements, denied that a "single point turn" was required, and contended that the government's prior approval of design changes to relocate a dumpster did not excuse errors later discovered. (R4, tab 27 at 1, 7)

The COFD acknowledged that "The Government is currently withholding or retaining $373,166.96 on the contract." The CO said that the contract was to have been completed by June 27, 2013, but that "the contractor did not receive actual contract completion and BOD until February 28, 2014, which is 246 days late." The CO denied GSC's request for an extension and said the government was not responsible for these delays. He denied that BOD occurred on October 9, 2013 "when Army personnel started storing equipment and furniture in the building," because "the contract requirements were not substantially completed." The CO acknowledged that the government continued to

14

hold $314,880 as liquidated damages, leaving "$58,286.96 remaining on the contract." He said the latter amount would be retained until successful completion of requirements such as furnishing As-Built drawings and O&M manuals. (R4, tab 27 at 7-8)

## DECISION

*ASBCA No. 59046*

According to appellant, it is entitled to an equitable adjustment for having to do additional work beyond contract requirements (app. br. at 1). GSC says that this involved "additional work involved [with] the installation of three types of pipes beyond the location of the manholes on [Dwg.] C120" (*id*. at 3 ¶ 8). That work included "a 10″ fire protection loop"; a "12″ sanitary sewer line…from the keyed note 2 manhole extending to the right to 'Currie Road'"; and "the 24″ water line seen in section D6 of [Dwg.] C120 (upper left corner of the drawing)" (*id*. at 3-4 ¶ 8). GSC seeks a total of $191,282.00 for this "Water Utilities Work." Appellant claims $92,641.47 for additional work at the "Turn around area," which required the relocation of a dumpster pad it had already installed with the government's approval. (*Id*. at 9 ¶ 32) GSC asserts that "While nothing in the contract required such an accommodation relating to 53' long trucks, the loading area as constructed actually accommodates trucks of that length" (*id*. at 7 ¶ 24).

As verified at hearing, of the $191,282.00 sought for "water utilities work," the 24″ water line is "about a $97,000 claim" whereas the sanitary sewer claim is "about $80,000" not including unspecified "markups" (tr. 3/40-41). Lacking more precise information, we calculate that GSC seeks $14,282 for the fire protection loop portion of the claim.

A common thread running through these disputed items is the parties' respective interpretations of amendments 4 and 7 to the RFP. Amendment 4 in relevant part referenced SOW ¶ 6.4.6 BASE UTILITY INFORMATION, particularly ¶ 6.4.6.1 UTILITIES regarding domestic water service, and referenced, among other things, information in Appendix J. Amendment 7 changed ¶ 6.4.6.1 to replace all references to the "Infrastructure Contractor" with "D/B" (design/build") contractor. (*See, e.g.*, gov't br. at 2-5, 17-18) This led to the controversy over who was responsible for doing what, and resulted in the government's partially settling the claim; we analyze the remaining issues.

### GSC's Legal Arguments for Entitlement and Quantum

According to GSC, "the Government's repeated modifications of the RFP led to an internally inconsistent and contradictory specification" (app. br. at 11). It maintains that it is entitled to an equitable adjustment under the contract's Changes clause, FAR 52.243-1 because the government constructively changed the contract.

15

(*Id.* at 11-13) A "constructive change" occurs "'when a contractor performs work beyond the contract requirements, without a formal change order under the [contract's] Changes clause, due either to an informal order from, or through the fault of, the government.'" *Lebolo-Watts Constructors*, ASBCA Nos. 59738, 59909, 2018 WL 6577624 (November 16, 2018, slip op. at 28) citing *M.A. Mortenson Co.*, ASBCA No. 53229, 05-1 BCA ¶ 32,837 at 162,469-70 and *Ets-Hokin Corp. v. United States*, 420 F. 2d 716, 720 (Ct. Cl. 1970). "The theory of constructive change is to compensate a contractor for work that might properly have been directed through the contract's changes clause, but which was not. *See Zafer Taahhut Insaat ve Ticaret A.S. v. United States*, 833 F. 3d 1356, 1361 (Fed. Cir. 2016)." *Charles F. Day*, ASBCA No. 60211, 19-1 BCA ¶ 37,215 at 181,175. To recover, the contractor must prove not only that it was made by the government to perform in excess of the contract but also that it suffered "increased costs compared to what was otherwise required by the contract...." *Charles F. Day,* 19-1 BCA ¶ 37,215 at 181,175 (citing *Norcoast Constructors, Inc.*, ASBCA No. 12751, 72-2 BCA ¶ 9699 at 45,285). In the instant appeal, the contract specifically incorporated GSC's proposal by reference, and obligated the contractor to provide betterments it offered in response to the RFP.

As these appeals involve both entitlement and quantum, GSC asserts that "[i]t is well-settled that the measure for an equitable price adjustment is the difference between the reasonable cost of performing the contract as awarded absent the change and the reasonable cost of performing with the change. (*See Keco Indus., Inc. v. United States*, 364 F. 2d 838, 850 (Ct. Cl. 1966) cert. denied 386 U.S. 958 (1967); *Nager Elec. Co. v. United States*, 442 F.2d 936, 946 (Ct. Cl. 1971))." (App. br. at 13)

*Discussion*

Even where the contractor demonstrates that the government constructively changed the contract and that it is entitled to additional costs, it is incumbent upon it as proponent to prove the amount it is owed. The "burden of proof is upon the party asserting a right." *Parsons Evergreene*, ASBCA No. 58634, 19-1 BCA ¶ 37,251 at 181,312 citing *Black Tiger Company*, ASBCA No. 59819, 18-1 BCA ¶ 37,046 at 180,336.

GSC asserts that "because the *quantum* of Appellant's damages is supported by contemporaneous cost data in the record and the Government has presented no basis to dispute Appellant's claimed costs, the Board should enter judgment on *quantum* on GSC's favor" (app. br. at 1). It describes the loss it suffered in this appeal as follows, and relies upon the evidence as cited:

16

| Cost Category | Amount |
|---|---|
| Water Utilities Work | $191,282.00 App. Exs. 1, 4-6 |

(*Id.* at 9, repeated at 13)

### *1. Potable (Domestic) Water Line*

Appellant says the government owes it for the relocation of a main waterline that ran under a parking lot (app. br. at 3-4 ¶ 8; tr. 2/8). The issue is whether the contract required appellant to relocate that main (*see* tr. 2/8). Appellant relies upon specification § 6.4.6.1.(c) (*see* tr. 3/41), which says: "[P]rovide the potable water service between the main line to the 5-foot line of the building. Provide potable water service from the 5-foot line to the facility.... The Government will provide primary or main water pipe distribution...." (R4, tab 4(e) at 1819) That specification does not say that appellant would relocate the water main; indeed, to the extent it addresses a water main at all, it points to the government as the responsible party: "The Government will provide primary or main water pipe distribution" (*id.*). The government does not address that specification, but points (gov't resp. at 2; gov't br. at 3) to a drawing note that references a waterline, which the note states "WILL NEED TO BE REROUTED" (R4, tab 4(p) at 4093 n.4). The note does not say that the contractor would be responsible for that work.

We find that the government constructively changed the contract, thereby entitling appellant to recover $97,000 for relocation of the water main.

### *2. Fire Protection Loop*

GSC asserts the government owes it for the installation of a "fire protection loop," which is a waterline dedicated to the warehouse's fire protection system (app. br. at 3-4 ¶ 8; tr. 2/8-10). The issue is whether the contract required appellant to install that loop. Again, GSC relies upon specification § 6.4.6.1.(c) (*see also* tr. 3/42), which provides that "[t]he Government will...route the fire water line (separate from the domestic supply) to 5 feet from the building." (R4, tab 4(e) at 1819) And again, the government does not address that specification, but points (gov't resp. at 2; gov't br. at 4, ¶ c) to a drawing note that states that "CONTRACTOR...WILL ROUTE FIRE WATERLINE" and "CONTRACTOR WILL TAKE FIRE WATER LINE AND ROUTE WITHIN THE BUILDING" (R4, tab 4(p) at 4102 n.4).

The contract instructs the contractor to "<u>route</u> the fire water line" as indicated (underlining added). This directs GSC on the placement of this pipe as part of the installation. Reading this provision to require the government to install the fire protection loop but then have GSC route it "to 5 feet from the building" is not reasonable, and would create a patent ambiguity that required appellant to inquire before submitting its

17

proposal, and there is no proof that it did so. *See, e.g., KiewitPhelps*, ASBCA No. 61197, 2019 WL 2052448, slip. op. at 25. GSC's proposal, which was incorporated by reference into the contract, also provides in relevant part: "An 8 inch PVC fire loop will then circumvent the building approximately 1500 lf to complete the required fire protection loop" (R4, tab J at 3321). Because both the contract and its proposal obligate GSC to furnish the fire protection loop, we deny this portion of the claim. Further, as there was no proof that the government ordered GSC to "upsize" the pipe, GSC cannot recover for that change.

### 3. Sanitary Sewer Main

According to GSC, the government improperly required appellant to install a "sanitary sewer main" (tr. 2/5-6). GSC says that specification ¶ 6.4.6.1.(d) sets forth its contractual obligations regarding sewer installation. It maintains that it was only required to "design and construct the sanitary sewer service line *between the sanitary sewer main to 5 feet from the building, including cleanout or manhole*." GSC says that "The record clearly shows that all of the utility work claimed by GSC is outside of the line of the manholes [that were] 30-40 feet from the CIF." (App. br. at 11) (emphasis in original)

The government disagrees, and regards construction of the sanitary sewer main as part of GSC's obligation as both "infrastructure" and "Design/build" contractor (gov't br. at 17-18). It relies upon contract Dwg. C120, which depicts the sewer main (labeled "6" SS"), but that drawing does not address who was to install it (gov't resp. br. at 10-11; R4, tab 4(e) at 2447).

The Board addressed the government's argument that GSC is responsible for providing a sanitary sewer main in *GSC Construction, Inc.*, ASBCA No. 59046, 14-1 BCA ¶ 35,739 at 174,919, in which we denied the government's motion for summary judgment. There, we interpreted contract specification ¶ 6.4.6.1.(d) to require appellant only to "design and construct the sanitary sewer service line *between* the sanitary sewer main *to* 5 feet from the building" (R4, tab 4(p) at 3474) (emphasis added). We did not agree that this provision obliged GSC to install a sewer main. In this decision on the merits, we agree with that analysis and hold that appellant is entitled to recover $80,000 for the installation of the sewer main.

### ASBCA No. 59957

GSC's claim of February 11, 2015 sought to recover for changes to the completed truck turnaround, the return of liquidated damages and retainage withheld by the government, and claim preparation costs. The contractor maintains that the government "wrongfully with[held] over $350,000 in payments" as liquidated damages and retainage, even though the government-ordered "additional work [that] increased GSC's time and cost of performance by 99 days and $92,641.47." The contractor further argues that "Beneficial

18

occupancy of the CIF occurred on October 9, 2013 when [government] personnel started storing equipment and furniture in the building." (App. br. at 8 ¶¶ 29-30) GSC seeks $373,166.96 for "Withheld payments [liquidated damages]" and retainage and asks for $3,000.00 for "claim preparation costs." Appellant says that "These costs were the subject of claims submitted to the contracting officer by letters, dated June 11, 2013." (*Id.* at 9 citing R4, tabs 2, 28)

### 1. Truck Turnaround

The government ordered appellant to redesign and reconstruct the truck turnaround area because, the government says, "In November 2013, a tractor-trailer hauling a 53 foot shipping container was unable to maneuver the provided space and back up to the loading dock in order to unload the equipment for the piled rack storage system" (gov't br. at 11 ¶ 33). It is not necessary to ascertain what the contract required regarding the turnaround, because the government points to no evidence that is first hand or of sufficient weight to show that a tractor-trailer hauling a 53-foot shipping container had trouble using the loading dock. Rather, the government cites the testimony of its contract manager (gov't br. at 11 ¶ 33; tr. 2/245, 255, 3/46-47), but he said that he heard it from another government employee (tr. 2/255, 269-71, *see also* tr. 3/46). Because the government fails to credibly demonstrate that the truck turnaround area did not meet specifications, GSC is entitled to the cost of the redesign and reconstruction of that area. *See Ensign-Bickford Aerospace & Defense Co.*, ASBCA No. 57929, 16-1 BCA ¶ 36,533 at 177,969 (the contractor is entitled to an equitable adjustment if the government fails to meet its burden of proving that the rejected work did not comply with the contract).

GSC claims $92,641.47 for this item, and cites certain documentary evidence that the government does not address (app. br. at 13 citing app. ex. 3). That evidence is sufficient to establish that appellant spent $92,641.47 on the redesign and reconstruction of the turnaround area. We find appellant is entitled to this amount, plus applicable interest, for this extra work.

### 2. Liquidated Damages

Appellant challenges the government's withholding of $314,880[6] in liquidated damages (app. br. at 9, 13). The contract completion date was June 27, 2013, and the contract says that liquidated damages would be $1,280 for each day of late completion. In challenging the government's assessment of liquidated damages (app. reply br. at 13-15; app. sur-reply br. at 11-16), appellant asserts that the government delayed completion by 112 (or 114) days related to water utility work and 99 days related to the truck turnaround

---

[6] Although appellant's brief states that it seeks $373,166.96 in "Withheld Payments [liquidated damages]" (app. br. at 9, 13), this amount includes $55,600 in separate retainage for allegedly incomplete or defective work.

area and overzealous inspection of a fire control system (app. sur-reply br. at 4-5, 12-13). However, appellant does not prove those delay periods, and furnishes no analysis that addresses whether any of those delays were concurrent. *See George Bernadot Co.*, ASBCA No. 42943, 94-3 BCA ¶ 27,242 at 135,741-42; *compare H.G. Reynolds Co.*, ASBCA No. 42351 *et al.*, 93-2 BCA ¶ 25,797 at 128,378.

Nevertheless, the government took beneficial occupancy of the warehouse on October 2, 2013, when it started using it, and cannot assess liquidated damages after that date. *See Strand Hunt Construction, Inc.*, ASBCA No. 55905, 13 BCA ¶ 35,287 at 173,188 (In assessing "beneficial occupancy" (also referred to as "substantial completion"), which "occurs on the date the work is completed satisfactorily to the extent that the facilities in question may be occupied or used by the Government for the purpose for which intended," we consider "'(1) the quantity of work remaining to be done, and (2) the extent to which the project was capable of servicing adequately its intended purpose'" (further citation omitted)).

October 2, 2013 was only 98 days after June 27, 2013, GSC's contract completion date, which, at $1,280 per day, allows an assessment of liquidated damages of $125,440. The difference between the $314,880 withheld by the government and $125,440.00 is $189,440. GSC is, therefore, entitled to this last amount in withheld liquidated damages plus applicable interest.

### 3. Retainage and Other Withheld Funds

The government concedes that appellant is entitled to $3,136.96 in retained funds (gov't br. at 26-27). Appellant seeks the return of another $55,600 in retained funds (app. reply br. at 12), which the government is withholding until issues with certain deliverables "have been satisfactorily resolved" (R4, tab 27 at 8). However, the government has not met its burden to demonstrate that the items for which funds have been retained are defective. *See Ensign-Bickford*, 16-1 BCA ¶ 36,533 at 177,969 (assigning burden). The government relies upon the COFD and its cross-examination of a witness identified with appellant (gov't br. at 26-27 ¶ 59), but none of that evidence demonstrates that any of the items was or is defective. Appellant is entitled to $58,736.96 in retained funds.

### 4. Claim Preparation Costs

Appellant requests $3,000 in claim preparation costs (app. br. at 13), but presents no persuasive evidence in support of that very sparse claim. This portion of the appeal is denied.

20

## CONCLUSION

ASBCA No. 59046 is sustained in the amount of $177,000, plus interest pursuant to 41 U.S.C. § 7109, from March 18, 2013 (the date that the contracting officer received appellant's certified claim (R4, tab 2 at 1)), to the date of payment.

ASBCA No. 59957 is sustained in the amount of $340,818.43, which includes $92,641.47 (truck turnaround) + $189,440 (return of liquidated damages) + $3,136.96 (retainage conceded by the government) + $55,600 (government-withheld funds for allegedly deficient work). GSC is also entitled to interest on the total amount owed pursuant to 41 U.S.C. § 7109, from February 11, 2015 (the date that the contracting officer received appellant's certified claim (R4, tab 27 at 1)), to the date of payment. The appeals are otherwise denied. The parties' other positions are unnecessary to address, given these results.

Dated: July 11, 2019

REBA PAGE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Vice Chairman
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

21

I concur

I concur in part-no separate opinion

_____
DONALD E. KINNER
Administrative Judge
Armed Services Board
of Contract Appeals

_____
TIMOTHY P. MCILMAIL
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 59046, 59957, Appeals of GSC Construction, Incorporated, rendered in conformance with the Board's Charter.

Dated:

_____
PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

22